**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CLIFTON WHITE,

      Plaintiff,

v.                                                                                    No. 1:21-cv-1204-MIS-JFR

LISA PADILLA, et al.,

      Defendants.

**ORDER DENYING DEFENDANT CORECIVIC'S MOTION TO DISMISS AND
GRANTING IN PART AND DENYING IN PART NEW MEXICO CORRECTIONS
DEPARTMENT DEFENDANTS' MOTION TO DISMISS**

      **THIS MATTER** is before the Court on Motions to Dismiss from Defendant CoreCivic, Inc., ECF No. 64; and Defendants Judith Anderson, Cathy Catanach, German Franco, Elijah Langston, Alisha Tafoya Lucero, Joe Lytle, Melissa Ortiz, Lisa Padilla, and Anthony Romero (collectively, "NMCD Defendants"), ECF No. 68. Plaintiff Clifton White ("Plaintiff") responded to each motion, respectively, ECF Nos. 71, 77, and Defendants replied, respectively, ECF Nos. 73, 80. Upon due consideration of the parties' submissions, the record, and the relevant law, the Court will **DENY** Defendant CoreCivic's Motion to Dismiss, ECF No. 64, and **GRANT IN PART** and **DENY IN PART** NMCD Defendants' Motion to Dismiss, ECF No. 68.

## I.     FACTUAL BACKGROUND[1]

In May 2002, a Grand Jury sitting in the District of New Mexico indicted Plaintiff on two counts of Armed Robbery for incidents which occurred on February 22, 2002, and March 4, 2002 ("Case No. 1"). ECF No. 61 ¶ 32. In July 2003, a Grand Jury sitting in the District of New Mexico indicted Plaintiff on charges of Kidnapping; Armed Robbery; Trafficking; Aggravated Assault with a Deadly Weapon; Conspiracy; Battery; and Possession of one ounce or less of Marijuana ("Case No. 2").[2] *Id.* ¶ 33.

On December 17, 2003, Plaintiff entered into a plea agreement consolidating both cases. *Id.* ¶ 34. Plaintiff pleaded guilty to one count of Armed Robbery in connection with Case No. 1, and to Armed Robbery, Trafficking, Conspiracy to Commit Armed Robbery, and two counts of Aggravated Assault with a Deadly Weapon in connection with Case No. 2. *Id.*

The Court entered a Judgment and Sentence on February 19, 2004, which provided that Plaintiff's sentences for the Armed Robbery and Trafficking charges would run concurrently and his sentences for the remaining charges would run consecutively. *Id.* ¶¶ 36-37. The Court sentenced Plaintiff to nineteen years of a suspended sentence with six years of incarceration. *Id.* Plaintiff then spent several years in and out of prison for various probation violations, receiving credits towards his sentence along the way. *Id.* ¶¶ 38, 44. Plaintiff was finally released from probation, parole, and detention on October 28, 2020. *Id.* ¶ 92.

The instant action arises from Plaintiff's continued incarceration, probation, and parole supervision following September 6, 2016—the date when Plaintiff's custodial supervision on Case

---

[1] The Court accepts the truth of all well-pleaded factual allegations in Plaintiff's Third Amended Complaint and draws all reasonable inferences in Plaintiff's favor for the purposes of this Motion.

[2] Plaintiff's Third Amended Complaint does not identify when the incident giving rise to Case No. 2 occurred.

Nos. 1 and 2 *should* have ended. *Id*. ¶ 95 (referencing a 2020 finding by the Second Judicial District Court for the State of New Mexico that Plaintiff's supervisory period should have ended on that date, ECF No. 61-22).

In what is now his Third Amended Complaint, Plaintiff levels various allegations against nine named Defendants from NMCD (discussed *infra* Section III.B.3). Briefly, Plaintiff alleges that various NMCD Defendants either (1) knew that Plaintiff's continued incarceration was unjustified and failed to act, or (2) actively participated in Plaintiff's overincarceration. *See generally id*. ¶¶ 72-86.

Plaintiff does not make allegations against CoreCivic employees by name, but rather implicates CoreCivic through allegations made against a variety of Jane and John Does. Specifically, Plaintiff alleges that various Doe defendants employed by either NMCD or CoreCivic: (1) "created entries in NMCD's in-house sentence-tracking and calculation systems . . . to account for the illegal calculation [of Plaintiff's sentence,]" *id*. ¶ 54; (2) were in a position of authority . . . to act on information of illegal and unconstitutional calculations of [Plaintiff's] sentence and were notified of the illegal calculations . . . and failed to investigate[,]" *id*. ¶ 27(a); (3) "had access to and/or authority concerning NMCD's in-house sentence-tracking and calculation systems and recklessly, intentionally, and/or maliciously approved, overlooked, entered, or overrode calculations of [Plaintiff]'s sentence[,]" *id*. ¶ 27(b); and (4) "provided misleading, false, and/or erroneous information to the State District Court and to prosecutors concerning the calculation of [Plaintiff's] sentence[,]" *id*. ¶ 27(c).

Plaintiff brings claims against the NMCD Defendants under 42 U.S.C. § 1983, alleging that the NMCD Defendants' actions constitute violations of the Eighth and Fourteenth Amendments to the United States Constitution. *Id*. ¶¶ 96-100; 101-105. Plaintiff also brings claims

against CoreCivic, alleging that CoreCivic's Doe employees' actions constitute the torts of (1) false imprisonment and (2) negligence under New Mexico law. *Id.* ¶¶ 105-108; 109-112. Both NMCD Defendants and CoreCivic now move to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of their Motion, NMCD Defendants invoke the doctrine of qualified immunity. *See* ECF No. 68. Defendant CoreCivic argues only that Plaintiff's claims are barred by the statute of limitations. *See* ECF No. 64.

## II.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A claim is facially plausible when the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While reviewing courts "must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*[3]

The Court's review is also limited by the scope of the pleadings before it: "[t]he nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

---

[3] Plaintiff repeatedly alleges that certain Defendants were knowledgeable that he was incarcerated without lawful basis. *See* ECF No. 61 ¶¶ 9, 26, 39. Such assertions are wholly conclusory, however, absent facts demonstrating as much.

The Court notes that NMCD Defendants assert a qualified immunity defense. The assertion of a qualified immunity defense at the motion to dismiss stage "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). "Specifically, the court analyzes 'the defendant's conduct as alleged in the complaint.'" *Id.* (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)).

## III.   DISCUSSION

### A.  Plaintiff's claims against CoreCivic

Plaintiff brings only New Mexico state law tort claims against Defendant CoreCivic, alleging (1) false imprisonment and (2) negligence. *See* ECF No. 61 ¶¶ 105-108, 109-112. CoreCivic moves to dismiss Plaintiff's Complaint on the grounds that the claims against it are time-barred.[4] ECF No. 64 at 1. The Court finds that under New Mexico state law, the torts of false imprisonment and negligence (in this specific context) do not begin to accrue until the last date of wrongful incarceration. As such, CoreCivic's Motion must be denied.

### 1.  The PLRA and *Heck v. Humphrey*

Under New Mexico law, tort claims for personal injury become barred three years after the date of accrual.[5] *See* N.M.S.A. 1978, § 37-1-8. CoreCivic argues that Plaintiff's claims began to accrue as of April 20, 2018—the day Plaintiff was first incarcerated at a CoreCivic facility and

---

[4] CoreCivic's challenge to the timeliness of Plaintiff's claims is appropriately before the Court. "Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Torrez v. Eley*, 378 F. App'x 770, 772 (10th Cir. 2010) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).

[5] Under New Mexico law, claims against government entities for personal injury are subject to a two-year statute of limitations. *See* N.M.S.A. 1978 § 41-4-15(A). The Third Amended Complaint alleges that CoreCivic is a "foreign for-profit limited corporation[,]" not a government entity. ECF No. 61 ¶ 28.

began to raise the issue of his wrongful detention with CoreCivic employees. *See* ECF No. 61

¶ 72(o), (q), (r), (v). In CoreCivic's telling, the statute of limitations on Plaintiff's claims thus

expired on April 20, 2021. However, Plaintiff did not name CoreCivic as a Defendant until his

Third Amended Complaint, filed on June 2, 2023. *See* ECF No. 61.

Plaintiff counters, arguing that (1) the Prison Litigation Reform Act ("PLRA") prevented

him from bringing claims against CoreCivic until October of 2020; (2) the doctrine established by

*Heck v. Humphrey*, 512 U.S. 477 (1994), did the same; and (3) his claims against CoreCivic relate

back to his claims made against individual Defendant Judith Anderson.[6] *See* ECF No. 71 at 2, 5.

In Plaintiff's telling, the date of accrual for his state-law claims did not begin until the Second

District Court of the State of New Mexico issued its Order invalidating his continued supervision

on October 27, 2020. By Plaintiff's logic, the statute of limitations on his state-law claims thus ran

until October 2023, and his claims against CoreCivic (first leveled in June 2023) are timely.

Plaintiff first argues that the PLRA prevented him from suing CoreCivic while

incarcerated. The language of the PLRA is clear: "No *Federal* civil action may be brought by a

prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury

suffered while in custody without a prior showing of physical injury or the commission of a sexual

act[.]" 42 U.S.C. § 1997e(e) (emphasis added). Plaintiff, however, brings no federal claim against

CoreCivic, and nothing in the PLRA precluded Plaintiff from independently bringing state law

claims against CoreCivic. As such, Plaintiff cannot look to the PLRA to provide relief from the

statute of limitations.

---

[6] Plaintiff alternately identifies Defendant Anderson as an NMCD employee, ECF No. 61 ¶¶ 10-11, and a CoreCivic employee, ECF No. 71 at 5. CoreCivic's briefing provides no clarity as to Defendant Anderson's employment history. Given the sparse briefing before it, as well as the importance of Defendant Anderson's employment history as to any claim of relation back, the Court declines to address that issue here.

Plaintiff also posits that the doctrine established by the Supreme Court in *Heck v. Humphrey* served to bar his claim until the Order invalidating his continued custodial supervision was issued. *See* ECF No. 71 at 3-4. In *Heck*, the Supreme Court held "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, [or] declared invalid by a state tribunal authorized to make such determination[.]" 512 U.S. at 486-87. *Heck*'s logic is premised upon "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." 512 U.S. at 486.

First, the Court notes that *Heck* is primarily invoked in the context of claims made under Section 1983—where it is clearly applicable. Plaintiff, however, brings his claim against CoreCivic under state law. As CoreCivic notes, a state law tort action by Plaintiff regarding the failure of CoreCivic (or NMCD Defendants) to appropriately process his time remaining in custodial supervision would not require the setting aside of Plaintiff's conviction. ECF No. 73 at 4. It would, however, necessarily implicate the validity of his sentence.

Because the Tenth Circuit has yet to directly rule on the applicability of *Heck* to state law claims, and because the Court finds that under New Mexico law, Plaintiff's claim for false imprisonment did not begin to accrue until his release, *see* Section III.A.2, *infra*, the Court declines to rule on the applicability of *Heck* to Plaintiff's state law claims. *See also Boulden v. Roark,* No. 121CV00440KWRJHR, 2023 WL 6533020, at *6 (D.N.M. Oct. 6, 2023) (declining to address the same issue, given the failure of the party favorably invoking *Heck* to cite Tenth Circuit precedent for the applicability of *Heck* to state law claims).

### 2.  False imprisonment accrual under New Mexico state law

The timeliness of Plaintiff's claims is contingent on when the tort of false imprisonment begins to accrue under New Mexico state law. In determining the answer, the Court must "look to the rulings of the highest state court[.]" *Nelson v. United States*, 915 F.3d 1243, 1248 (10th Cir. 2019). However, the New Mexico Supreme Court has never ruled on the specific question of when claims for false imprisonment begin to accrue under state law.

As CoreCivic notes, New Mexico state courts have frequently applied the so-called "discovery rule" in determining the date of accrual for various personal injury torts. *See* ECF No. 64 at 5. That rule establishes that "the [accrual] time period begins to run when the claimant has knowledge of sufficient facts to constitute a cause of action." *Gerke v. Romero*, 237 P.3d 111, 115 (N.M. Ct. App. 2010) (holding that the "discovery" rule was applicable to instances of exposure to toxic substances and noting its applicability across various other tort fields to include medical malpractice, products liability, and professional negligence).

False imprisonment, however, is a unique form of personal injury. As the United States Supreme Court has noted, "[t]he running of the statute of limitations on [common-law] false imprisonment is subject to a distinctive rule—dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned." *Wallace v. Kato*, 549 U.S. 384, 389 (2007). Given the dissimilarity between the tort of false imprisonment and those torts which have previously been found subject to the "discovery" rule, the Court cannot assume that the "discovery" rule applies in the false imprisonment context.

Faced with a dearth of clear guidance, the Court looks to various analyses of the accrual issue conducted within the District of New Mexico. In numerous instances in this District, federal judges tasked with determining when the tort of false imprisonment may accrue under New Mexico state law have found that the statute of limitations for false imprisonment tort claims

begins to run only as of the last date of wrongful detention or incarceration. *See, e.g.*, *Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley*, 727 F. Supp. 2d 1256, 1263-64 (D.N.M. 2010) (finding that the New Mexico Supreme Court would likely "follow in the footsteps of the *Restatement (Second) of Torts*, which states that the statute of limitations begins to run from the time imprisonment ends"); *Smith v. Alamogordo Police Dep't*, No. 21-CV-1084 MV/SMV, 2022 WL 16834032, at *5 (D.N.M. Nov. 9, 2022), *report and recommendation adopted*, No. 21-CV-1084 MV/SMV, 2023 WL 142561 (D.N.M. Jan. 10, 2023) ("A false imprisonment claim accrues on the last day on which a plaintiff alleges he was falsely imprisoned."); *Maho v. Hankins*, No. CV 19-182 KK/SCY, 2019 WL 6781207, at *6 (D.N.M. Dec. 12, 2019) ("To determine when Plaintiff's state-law claims for false imprisonment and malicious abuse of process accrued, the Court looks to New Mexico law . . . . The Court predicts the New Mexico Supreme Court would rule that Plaintiff's claim for false imprisonment under the NMTCA accrued, at the latest, on the last date on which he alleges he was falsely imprisoned[.]").

Indeed, the Court has found no authority to the contrary. The Court will thus join the chorus of those judges predicting that under New Mexico state law, the tort of false imprisonment would be held to accrue as of the last date of wrongful detention or incarceration.[7]

As to when Plaintiff's negligence claim accrued under New Mexico state law, the Court notes that New Mexico state courts have not yet been faced with the question of when the tort of negligence begins to accrue under similar circumstances. As in the personal injury context, New Mexico courts have formally adopted the "discovery" rule for negligence claims arising from

---

[7] Plaintiff's incarceration in a CoreCivic facility ended in September 2019 (at which point it appears he was transferred to a state-run facility). ECF No. 61 ¶ 72(o). The Court, however, declines to find that the period of accrual began on this date, because such a result runs counter to the justifications for extending the accrual date for claims of false imprisonment: regardless of which entity, exactly, is responsible for a given plaintiff's incarceration, the fact remains that "that the victim may not be able to sue while he is still imprisoned." *Wallace*, 549 U.S. at 389.

various personal injury torts (such as medical malpractice). *See Roberts v. Sw. Cmty. Health Servs.*, 837 P.2d 442, 451 (N.M. 1992). Here, however, CoreCivic's allegedly negligent behavior is inextricably intertwined with their alleged commission of the tort of false imprisonment. In light of the concerns that justify extending the date of accrual for claims of false imprisonment—namely, that incarcerated plaintiffs face particular challenges to bringing suit—the Court predicts that New Mexico state law, unsettled on this point, would likely find that negligence claims made specifically in the false imprisonment context accrue concurrently with the tort of false imprisonment itself. As such, the Court finds that Plaintiff's negligence claim did not begin to accrue until October 2020.

In sum: Plaintiff's last date of wrongful incarceration was October 28, 2020. The Court predicts that under New Mexico state law, the statute of limitations for Plaintiff's false imprisonment and negligence claims did not begin to run until that date. In New Mexico, the statute of limitations for personal injury tort claims against non-government entities is three years. N.M.S.A. 1978, § 37-1-8. As Plaintiff added CoreCivic as a Defendant on June 2, 2023—within the three-year limitations period—his state law claims against CoreCivic are timely. CoreCivic's Motion to Dismiss, ECF No. 64, must accordingly be **DENIED**.

### B. NMCD Defendants

Plaintiff brings suit against NMCD Defendants under 42 U.S.C. § 1983, which "provides a cause of action against state officials who violate constitutional or other federally protected rights." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). Plaintiff alleges that the actions of various NMCD Defendants, discussed *infra*, constituted violations of Plaintiff's Eighth and Fourteenth Amendment rights. ECF No. 61 ¶¶ 96-100, 101-104. NMCD Defendants move to dismiss Plaintiff's claim on the grounds that they are subject to qualified immunity. ECF No. 61

at 1. The Court finds that individual Defendants Anderson, Catanach, Padilla, Langston, Franco, and Romero may successfully invoke qualified immunity. Defendants Tafoya Lucero, Lytle, and Ortiz cannot.

### 1.  The doctrine of qualified immunity

"Qualified immunity protects governmental officials from liability for civil damages insofar as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Perry v. Durborow*, 892 F.3d 1116, 1120 (10th Cir. 2018) (quoting *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010)).

"A § 1983 defendant's assertion of qualified immunity is an 'affirmative defense [that] creates a presumption that the defendant is immune from suit.'" *Truman*, 1 F.4th at 1235 (quoting *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020)). To overcome that presumption, plaintiffs must satisfy a two-prong test, demonstrating that: "(1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct." *Id*. (quoting *Thomas*, 765 F.3d at 1194). "If the plaintiff fails to satisfy *either part* of this two-part inquiry, the court must grant the defendant qualified immunity." *Hesse v. Town of Jackson, Wyo*., 541 F.3d 1240, 1244 (10th Cir. 2008) (emphasis added).

As to the first prong of the analysis, the Tenth Circuit has "stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants. 'It is particularly important' that plaintiffs 'make clear exactly who is alleged to have done what to whom, . . . as distinguished from collective allegations.'" *Pahls*, 718 F.3d at 1225 (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)).

As to the second prong of the analysis, "[a] right is clearly established 'when a Supreme Court or Tenth Circuit[8] decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains.'" *Truman*, 1 F.4th at 1235 (quoting *Thomas*, 765 F.3d at 1194). A precedent is "considered on point if it involves 'materially similar conduct' or applies 'with obvious clarity' to the conduct at issue." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (quoting *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016)).

Put another way, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). The test for clarity requires that "[e]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Complete factual symmetry is not an absolute prerequisite for determining whether a violation is clearly established: "a prior case need not be exactly parallel to the conduct [at issue] for the officials to have been on notice of clearly established law." *Truman*, 1 F. 4th at 1235. (quoting *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020)). "There can also be 'the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Id*. at 1236 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). The Supreme Court has emphasized, however, that "courts must

---

[8] The Court notes its concern that this element of the qualified immunity analysis affords greater civil rights protections to individuals in more populous circuits, like those which encompass the West and East Coasts. Compared to the other Federal Circuits, the Tenth Circuit has one of the smallest populations and one of the lowest civil caseloads. *See Federal Judicial Caseload Statistics 2022 Tables*, U.S. Courts (Mar. 31, 2022), https://www.uscourts.gov/federal-judicial-caseload-statistics-2022-tables. Because there are fewer published opinions regarding Section 1983 in more rural circuits—such as the Tenth Circuit—individuals residing within those circuits have fewer clearly established civil rights than those in more heavily populated circuits.

12

not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 583 U.S. at 63-64 (internal citation omitted).

Finally, plaintiffs seeking to overcome qualified immunity must allege that defendants acted with the state of mind required to establish culpability for each alleged constitutional violation. *See Brown v. Montoya*, 662 F.3d 1152, 1169 (10th Cir. 2011). In addition to knowledge and intent, deliberate indifference may be sufficient when alleging both Fourteenth and Eighth Amendment violations. *See Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019). "The Supreme Court has explained that 'deliberate indifference entails something more than mere negligence.'" *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1154 (10th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Rather, "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. (citation omitted). "Thus, the Court has equated deliberate indifference to 'recklessness,' in which 'a person disregards a risk of harm of which he is aware.'" *Id*. (citations omitted).

## 2. Clearly established law

Following the NMCD Defendants' assertion of qualified immunity, it becomes Plaintiff's burden to demonstrate that any of the NMCD Defendants' actions violated clearly established law. *See Truman*, 1 F.4th at 1235. In this instance, Plaintiff alleges that Defendants' conduct violated clearly established law regarding both the Eighth and Fourteenth[9] Amendments—and must show as much.

---

[9] Plaintiff's Reply does not delineate between which rights are established by which cases under either the Eighth or Fourteenth Amendments. *See* ECF No. 77 at 15-19. Plaintiff also does not identify whether his Fourteenth Amendment claim is rooted in procedural or substantive due process. The Court interprets Plaintiff's due process claims as arising under the doctrine of substantive—rather than procedural—due process.

Plaintiff argues that it is clearly established law that "subjecting an individual to substantial overdetention amounts to a violation of due process and constitutes cruel and unusual punishment." ECF No. 77 at 16. But this is exactly the kind of broad general principle that the Supreme Court has repeatedly rejected as too ambiguous to create clearly established law for the purposes of the qualified-immunity analysis. *See City & Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 613 (2015) (citing *al-Kidd*, 563 U.S. at 742).

Rather, considering the Third Amended Complaint's repeated imputation of knowledge and/or deliberate indifference on the part of NMCD Defendants as to Plaintiff's wrongful incarceration, the Court considers a more specific question: whether it is clearly established law that the knowing—or deliberately indifferent—continued detention of prisoners past the point of the expiration of their sentence is unconstitutional. The Court finds that it is clearly established law that corrections officials commit a constitutional violation when they continue to imprison

---

"Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). In determining whether individuals were afforded procedural due process, the Tenth Circuit has established a two-part test: "(1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Id*. (citation omitted).

Here, Plaintiff's liberty interest in his own freedom clearly implicates the Fourteenth Amendment. Turning to the second prong, the Court first notes that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id*. (quoting *Mathews*, 424 U.S. at 333). In the context of incarceration, it is well established that "[p]rocedural due process requires a pretermination hearing where liberty or property interests protected by the Fourteenth Amendment are implicated." *Richardson v. City of Albuquerque*, 857 F.2d 727, 731 (10th Cir. 1988) (citing *Board of Regents v. Roth*, 408 U.S. 564, 567 (1972)). Plaintiff makes no allegations that he was deprived of a hearing as to his incarceration, and indeed himself references such a hearing taking place. *See, e.g.*, ECF No. 61 ¶ 73(e). Plaintiff never challenges NMCD Defendants' protocols and procedures as deficient.

Instead, Plaintiff challenges Defendants' alleged failure to adhere to their own procedures. As such, Plaintiff's claims arise under substantive due process. Substantive due process bars "certain government actions regardless of the fairness of the procedures used to implement them." *Id*. at 1171 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). "Executive action violates substantive due process when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id*. (quoting *Lewis*, 523 U.S.at 847). While he does not expressly invoke the doctrine of substantive due process, the Court construes Plaintiff's claims as alleging that the actions of various Defendants are conscience shocking.

individuals they know to be incarcerated without lawful basis, or when they are deliberately indifferent to the prospect that prisoners in their charge are incarcerated without lawful basis.

Plaintiff first cites two cases for seemingly purely definitional reasons: *Farmer v. Brennan*, 511 U.S. 825 (1994), for the general principle that prison officials are deliberately indifferent when they act or fail to act "despite awareness of a substantial risk of serious harm"; and *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995), for the definition of recklessness. ECF No. 77 at 15. The circumstances of both cases are so plainly different from the present instance that their invocation here is inapposite. Additionally, neither articulates a cognizable constitutional principle providing support for Plaintiff's claim.

The plaintiff in *Farmer* brought allegations of deliberate indifference against prison officials for placing them in the prison's general population (where they were assaulted and raped), despite prison officials' "knowledge that the penitentiary had a violent environment and a history of inmate assaults," and that plaintiff "would be particularly vulnerable to sexual attack" due to their feminine appearance. 511 U.S. at 831. In *Uhlrig*, the widower of a therapist employed by a state mental health hospital challenged the decision of state administrators to close a special unit for the criminally insane, thus allowing his wife's soon-to-be murderer to be transferred into the hospital where she worked. 64 F.3d at 569.

Although Plaintiff fails to point it out, the *Farmer* Court *did* hold that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." 511 U.S. at 828. But given the substantial differences between Plaintiff's claim and the circumstances in *Farmer*, that holding cannot stretch to cover Defendants' conduct here. As to *Uhlrig*, the Tenth Circuit panel in that case provided a helpful roadmap regarding what, exactly, constitutes "conscience shocking" behavior sufficient to incur liability under the Fourteenth

Amendment. 64 F.3d at 572-74. But Plaintiff invokes *Uhlrig*, too, at far too high a level of generality to provide clearly established law for Plaintiff's purposes.

Plaintiff also relies heavily on *Wolff v. McDonnell*, 418 U.S. 539 (1974). *Wolff*, however, differs from this case on both factual and legal grounds. In relevant part, the *Wolff* Court held that a Nebraska state prisoner challenging the revocation of his state-created good-time credits was entitled to minimum due process prior to the revocation of those credits. *See id.* at 556-558. But Plaintiff never alleges that NMCD actively revoked his good-time credits: rather, Plaintiff's entire Third Amended Complaint hinges upon his claim that NMCD Defendants *disregarded* their own policies and protocols in calculating his sentence. *See, e.g.*, ECF No. 61 ¶ 27(b). Plaintiff's claim is thus, notably, not a challenge to the actual procedures employed by the New Mexico Corrections Department, but to their execution (or lack thereof) as applied to him. As such, it can only be understood as a substantive due process claim, rather than a procedural one. Given that its holding covers procedural due process, *Wolff* does not suffice to demonstrate clearly established law here.

Plaintiff also highlights cases meant to demonstrate the slightly more specific principle that "subjecting an individual to substantial overdetention amounts to a violation of due process and constitutes cruel and unusual punishment." *See* ECF No. 77 at 18 (citing *Saiz v. Franco,* No. 15-CV-587, 2018 WL 1124197 (D.N.M. Feb. 27, 2018*)*; *Hainey v. Sirmons*, No. CIV-07-205-C, 2007 WL 2703166, at *7 (W.D. Okla. Sept. 14, 2007)).

The plaintiff in *Saiz* alleged that he was wrongfully incarcerated past the date on which he should have been released, following the failure of NMCD staff to appropriately credit him with good-time credits he had won back on appeal. 2018 WL 1124197, at *3. Judge James Parker of the District of New Mexico granted qualified immunity to the defendant (German Franco, also a named defendant in this case), on the grounds that he was not personally responsible for plaintiff's

continued incarceration or the failure to notify NMCD staff of plaintiff's successful appeal. 2018 WL 1124197, at *6.

Although the Court does not find *Saiz* relevant for the overly broad purpose stated by Plaintiff, *Saiz does* highlight the principle that "a prisoner's clearly established Eighth Amendment right of protection against cruel and unusual punishment is violated when he is held past his release date, as calculated pursuant to his operative judgment and state law, as a result of deliberate indifference." *Id.* at *10 (citation omitted).

That principle is clearly established by the weight of precedent from other circuits. The Ninth Circuit has also found, in similar circumstances to Plaintiff's, that "prison officials were deliberately indifferent to [a plaintiff's] constitutional rights because they failed to address his credible evidence that he was entitled to release." *Alexander v. Perrill*, 916 F.2d 1392, 1398 (9th Cir. 1990). The panel in *Alexander* noted the precedent established by *Haygood v. Younger*, 769 F.2d 1350 (9th Cir. 1985) (en banc), *cert. denied*, 478 U.S. 1020 (1986), in which the Ninth Circuit, sitting en banc, determined that "a judgment against prison officials was proper because 'after being put on notice, [the prison officials] simply refused to investigate a computational error.'" *Id.* at 1398 (quoting *Haygood*, 769 F.2d at 1355).

Echoing the Ninth Circuit, both the Seventh and Third Circuits have affirmed that deliberate indifference to the prospect of unlawful incarceration suffices to establish liability under the Eighth Amendment. *See Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015) ("A plaintiff states a claim for an Eighth Amendment violation if he is detained in jail for longer than he should have been due to the deliberate indifference of corrections officials.").

Unlike *Saiz*, however, *Hainey* neither provides clearly established law nor points the Court in its direction. In *Hainey*, then-Magistrate Judge Robert Bacharach (now of the Tenth Circuit Court of Appeals) denied prison officials qualified immunity following their wrongful application of consecutive (rather than concurrent) sentences, based on the specific question of "whether reasonable administrators would have recognized a constitutional violation by ignoring the trial court's order to treat the sentences as concurrent." 2007 WL 2703166, at *7. The denial of qualified immunity in *Hainey* hinged on the express failure of the corrections officials charged in that case to abide by a court's directive to run the plaintiff's sentences concurrently. *Id*. at *9. As to the factual dissimilarities between *Hainey* and Plaintiff's case, Plaintiff makes no allegations that NMCD Defendants failed to follow court orders.

What's more, while *Hainey* does discuss the *prospect* that "[i]mprisonment beyond one's term *can* constitute cruel and unusual punishment for purposes of the Eighth Amendment[,]" it does not do so in a manner this Court finds clear enough to have placed Defendants on notice that their behavior was unconstitutional. *See* 2007 WL 2703166, at *7 (emphasis added); *see also id.* nn. 25, 30 (discussing the *possibility* of overdetention giving rise to a claim under the Eighth Amendment).

Plaintiff also looks to *Jones v. Lopez*, 262 F. Supp. 2d 701 (W.D. Tex. 2001), in which the United States District Court for the Western District of Texas denied qualified immunity to a defendant who had kept plaintiff incarcerated beyond thirty days in the absence of a facially valid court order. The circumstances of *Jones* are also distinguishable: Plaintiff here makes no allegations regarding the absence of facially valid court orders. As discussed, he instead argues that the court orders leading to Plaintiff's wrongful detention were the byproduct of incorrect and/or fraudulent calculations by various defendants. *See, e.g.*, ECF No. 61 ¶ 63. *Jones* does,

however, both cite to and reiterate the Fifth Circuit's holding in *Whirl v. Kern*, 407 F.2d 781, 792

(5th Cir. 1968):

> [U]nlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries. While not a surety for the legal correctness of a prisoner's commitment, he is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.

*Id.* (citations omitted).[10]

While primarily a rejection of a corrections official's invocation of the "good faith" excuse

regarding the continued incarceration of a prisoner without lawful basis, *Whirl* implies, without so

saying, that a corrections official's *knowing* failure to effectuate a prisoner's timely release violates

the Fourteenth Amendment.

That principle is supported by extraneous circuit precedent: the Eighth Circuit has held that

prison officials who fail to release prisoners they know to be held without lawful basis violate the

Fourteenth Amendment. *See Davis v. Hall*, 375 F.3d 703, 716 (8th Cir. 2004) ("In any event,

whatever haziness obscures the exact contours of a duty to investigate burns off once the

authorities know that they have no basis for detention.") (citation omitted). In an unpublished

opinion, the Fourth Circuit has expressed the same. *See Golson v. Dep't of Corr.*, 1990 WL

141470, *1 (4th Cir. Oct. 2, 1990) (unpublished) ("Incarceration beyond the termination of one's

sentence may state a claim under the due process clause and the eighth amendment . . . to recover

---

[10] The *Whirl* Court's holding has been called into question as regards the potential for jailors to invoke "good faith" exceptions to the unlawfulness of incarceration when they act on facially valid court orders. *See Bryan v. Jones*, 530 F. 2d 1210, 1215 (5th Cir. 1976) (noting that subsequent decisions "cast considerable doubt on the wisdom or continued vitality of [*Whirl*].") Subsequent jurisprudence, however, does not diminish *Whirl*'s implicit finding as to the duty of jailors to release prisoners they *know* to be wrongfully incarcerated. Indeed, subsequent holdings from the Fifth Circuit have reiterated the essential principle that "a jailer has a duty to ensure that inmates are timely released from prison." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).

under the due process clause, a plaintiff must establish that defendants acted with something more than mere negligence.") (citations omitted).

Given the weight of extraneous circuit precedent, the Court finds that it was clearly established law, at the time of Defendants' alleged actions, that prison officials violate (1) the Eighth Amendment, when they continue to incarcerate prisoners held without lawful basis and are deliberately indifferent to that prospect; and (2) the Fourteenth Amendment, when they continue to incarcerate prisoners they *know* to be held unlawfully. The Court does not find that it was clearly established law that merely subjecting an individual to overdetention, absent the requisite state of mind, amounts to a constitutional violation.

### 3. Application

This is the rare instance in which "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Truman*, 1 F. 4th at 1240 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). As discussed *infra*, the knowing or deliberately indifferent incarceration of prisoners without lawful basis is a constitutional violation under both the Eighth and Fourteenth Amendments. Further, the commission of such act is so transparently egregious that it should be clear to any reasonable official that it is unlawful, regardless of circumstantial minutiae.

As to Defendants Padilla, Catanach, Langston, Franco, Romero, and Anderson, Plaintiff fails to allege facts sufficient to overcome those Defendants' invocation of qualified immunity. As to Defendants Tafoya Lucero, Lytle, and Ortiz, the facts as alleged in Plaintiff's Third Amended Complaint preclude those Defendants' from receiving qualified immunity at this stage of the proceedings.

Given the large number of named Defendants, the Court shall apply the requisite analysis to each in turn. Again, the Court looks to whether "(1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct." *Truman*, 1 F. 4th at 1235.

i.      Lisa Padilla, a Records Manager at Central New Mexico Correctional Center responsible for preparing Plaintiff's Good Time Figuring Sheet ("GTFS").[11] Plaintiff alleges that in 2015, Defendants Padilla and Romero had conversations with Plaintiff's partner about Defendant Padilla's inappropriate failure to credit Plaintiff with 311 days of pre-sentence confinement credit to which he was entitled. ECF No. 61 ¶ 45. As Plaintiff himself notes, he was released on June 6, 2015, after those conversations occurred. *Id*. ¶ 45-46.

Plaintiff then alleges that at a sentencing hearing in 2017, Defendant Padilla presented a GTFS "containing information different from [Plaintiff's] historical GTFS." *Id*. ¶ 73(e). It is not clear from the face of the Third Amended Complaint how Defendant Padilla's knowledge of the 311-days issue—already resolved at the time of Plaintiff's incarceration without lawful basis—makes Defendant Padilla liable for Plaintiff's subsequent erroneous incarceration.

Neither allegation suffices to establish either knowledge or deliberate indifference on Defendant Padilla's part as to Plaintiff's continued incarceration without lawful basis. Nor is it clear from the face of Plaintiff's Complaint how Defendant Padilla's actions specifically violated Plaintiff's constitutional rights, as is required under the first prong of the qualified immunity analysis. Defendant Padilla is thus entitled to qualified immunity.

---

[11] Plaintiff's Complaint confusingly notes that "there may be two defendants named Lisa Padilla[.]" The Court understands Plaintiff's allegations as being leveled against the individual named in Paragraph Four of Plaintiff's Complaint, the Records Manager at the Central New Mexico Correctional Center during the period of Plaintiff's incarceration there in 2014-15 (which Plaintiff misidentifies as "Central New Mexico Correctional Facility"). ECF No. 61 ¶ 4.

ii.     Cathy Catanach, the NMCD Classification Bureau Chief who was responsible for the oversight of Plaintiff's GTFS. *Id.* ¶ 7.

Plaintiff's Complaint contains no specific allegations against Defendant Catanach beyond outlining her role in the GTFS process. Nor does Plaintiff articulate a rationale as to why Defendant Catanach should be held responsible on a theory of supervisory liability. Defendant Catanach is thus entitled to qualified immunity under the first prong of the analysis.

iii.     Elijah Langston, the NMCD Probation and Parole Officer overseeing Plaintiff's probation and parole. Plaintiff alleges, *inter alia*, that Defendant Langston "was aware that [Plaintiff] was wrongfully under the jurisdiction of the State through several conversations with [Plaintiff], in addition to reviewing the history of [Plaintiff]'s underlying charges and sentence, and he failed to act or elevate despite his knowledge of the State's unconstitutional control over [Plaintiff's] liberty." *Id.* ¶ 86. The Court first notes that Plaintiff cites no facts sufficient to demonstrate knowledge or deliberate indifference on the part of Defendant Langston. And as the Third Circuit has succinctly articulated:

> Obviously, not every official who is aware of a problem exhibits indifference by failing to resolve it. A warden, for example, although he may have ultimate responsibility for seeing that prisoners are released when their sentences are served, does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter.

*Sample*, 885 F. 2d at 1110.

Plaintiff never alleges that Defendant Langston bore individual responsibility for either the execution or calculation of Plaintiff's sentence. As such, Plaintiff fails to overcome the first prong of the qualified immunity defense with regards to Defendant Langston, and Defendant Langston may successfully invoke qualified immunity.

iv.     German Franco, the Deputy Director for NMCD. Plaintiff alleges only that Defendant Franco told Plaintiff in conversation that "[a]nytime you come to the Corrections Department and you're not on parole, our practice is that you'll have to be paroled. You're just going to have to sue us." *Id.* ¶ 72(aa). Plaintiff also alleges that after raising his concerns with a John Doe contract monitor, the contract monitor told Plaintiff that he forwarded Plaintiff's concerns to Defendant Franco. *Id.* ¶ 72(t).

Defendant Franco's alleged comment to Plaintiff demonstrates neither (1) Defendant Franco's involvement in Plaintiff's continued incarceration, nor (2) awareness (or deliberate indifference) to the prospect of Plaintiff's unlawful incarceration. As Plaintiff's allegations against Defendant Franco fail to satisfy either prong of the qualified immunity analysis, Defendant Franco may successfully invoke qualified immunity.

Plaintiff does note that Defendant Franco was the supervisor responsible for the personnel system responsible for calculating prisoner sentences. ECF No. 61 ¶ 72(s). However, as with Defendant Catanach, Plaintiff fails to articulate a rationale for holding Defendant Franco liable under a theory of supervisory responsibility.

v.     Anthony Romero, a Deputy Director for NMCD. Plaintiff alleges that his partner had "numerous conversations with Defendant[] . . . Romero, to inform [him] that [Plaintiff] was not appropriately credited for the 311 days to which he was entitled[.]" *Id.* ¶ 45.

This cursory allegation fails to demonstrate any potential constitutional violation on the part of Defendant Romero. Those conversations took place in 2015—a year before Defendant's reincarceration in 2016. As with Defendant Padilla, the accusations leveled against Defendant Romero concern a previous issue (the failure of NMCD to credit Defendant with 311 days of pre-sentence confinement credit) initially thought resolved at the time of Defendant's subsequent

incarceration. Plaintiff's claim against Defendant Romero also does not allege either personal involvement by Defendant Romero in Plaintiff's subsequent incarceration, or that Defendant Romero was deliberately indifferent to, let alone knowledgeable about, Plaintiff's later being incarcerated without lawful basis. Plaintiff's claims against Defendant Romero resultantly do not overcome the barrier of qualified immunity.

vi.    Judith Anderson, a Records Manager for NMCD.[12] Plaintiff alleges that he and Defendant Anderson "had a conversation over the phone to address his complaint regarding the improper calculation of his sentence and improper input computation in the CMIS system[,]"[13] and that "Defendant Anderson was responsible for an improper override in the CMIS system." ECF No. 61 ¶ 72(q). Plaintiff also alleges that he "wrote to Defendant Anderson to inform her that he believed the calculations of his sentence were being manipulated and that court-ordered time served 'was not correctly attributed against [his] sentence[,]'" *id.* ¶ 73(a); that Defendant Anderson "met with [Plaintiff] and attempted to justify the fact that he was in the State's custody[,]" *id.* ¶ 73(b); and that Defendant Anderson "showed [Plaintiff] a handwritten calculation that was neither from the facility's calculation system nor from an official GTFS[,]" *id.*

Plaintiff's allegations, even taken as true for the purposes of this analysis, do not demonstrate knowledge on the part of Defendant Anderson as to Plaintiff's wrongful incarceration. In fact, they demonstrate the opposite: a sincere, if incorrect, belief that Plaintiff was justifiably incarcerated. Nor do Plaintiff's allegations demonstrate deliberate indifference to Plaintiff's claims

---

[12] As discussed in note 6, *supra*, Plaintiff alternately identifies Defendant Anderson as an NMCD employee, ECF No. 61 ¶¶ 10-11, and a CoreCivic employee, ECF No. 71 at 5. Defendant Anderson's instant appearance is made in the context of her role as an NMCD employee. *See* ECF No. 68 (in which Defendant Anderson is included in NMCD Defendants' Motion to Dismiss, with no challenge to her status as an NMCD Defendant).

[13] Plaintiff does not identify the meaning of the acronym "CMIS," but the Court understands it to refer to a centralized tracking system used for calculating incarcerated peoples' sentences.

regarding the miscalculation of his sentence. The opposite is true: Defendant Anderson's actions, as alleged, demonstrate an active effort to ensure that Plaintiff's sentence was appropriately calculated.

Of course, if Defendant Anderson's calculations were in fact wrong, that mistake is condemnable as a general matter. But that does not mean that Defendant Anderson violated clearly established law. As such, Defendant Anderson may invoke qualified immunity.

vii.     Alisha Tafoya Lucero, a Deputy Warden at the New Mexico Penitentiary in Santa Fe during a period of Plaintiff's incarceration there in early 2018. Plaintiff alleges that he had meetings with Defendant Tafoya Lucero, in which she "acknowledged that [she] reviewed Plaintiff's GTFS and sentence, that there had been a calculation error in NMCD's calculation of his sentence, and that he should not be under the jurisdiction of the State." *Id*. ¶ 70. Defendant Tafoya Lucero also allegedly "said she spoke with a Defendant Doe records custodian at [the Penitentiary of New Mexico] facility to look at [Plaintiff's] files and saw that there were many errors." *Id*. ¶ 72(i). After Plaintiff raised his concerns with her, Plaintiff alleges that Tafoya Lucero told him "[w]e were told to do it this way, and then we were told to do it that way. I know that we've made mistakes in your case, and from what I've seen today in only a short time reviewing your file, in my own calculations, you'll be discharged by December of this year [2018]." *Id*. ¶ 72(k). Plaintiff also alleges that "Tafoya Lucero . . . promised that she would make it her personal duty to address the improprieties." *Id*. ¶ 72(l).

As a deputy warden and one of the individuals "responsible" for Plaintiff's incarceration, Defendant Tafoya Lucero's actions satisfy the first prong of the qualified immunity analysis. Further, Plaintiff's allegations, if true, demonstrate actual knowledge on the part of Defendant Tafoya Lucero as to Plaintiff's incorrectly calculated sentence. As discussed *supra* Section III.B.2,

it was clearly established law at the time of this alleged conversation that a prison official's failure to release a prisoner they know to be incarcerated without lawful basis is a violation of the Fourteenth Amendment. Defendant Tafoya Lucero thus cannot successfully invoke qualified immunity at this stage of the pleadings, prior to a factual finding regarding her actual knowledge.

viii.   Joe Lytle, a Deputy Warden for NMCD who also served at New Mexico Penitentiary during a period of Plaintiff's incarceration there. While present at the above-described meetings in which Plaintiff raised his concerns with Defendant Tafoya Lucero, Defendant Lytle also allegedly acknowledged that NMCD had made errors in calculating Plaintiff's sentence. *Id*. ¶ 70.

As with his fellow warden Defendant Tafoya Lucero, Defendant Lytle's continued incarceration of Plaintiff satisfies the first prong of the qualified immunity analysis. Defendant Lytle's alleged presence at Plaintiff's alleged meeting with Defendant Tafoya Lucero, as well as his alleged acknowledgement of a sentencing error, also suffices to demonstrate either knowledge or, at the very least, deliberate indifference with regards to the prospect that Plaintiff was incarcerated without lawful basis. Defendant Lytle thus cannot invoke qualified immunity here.

ix.   Melissa Ortiz, a Warden and Deputy Director for the NMCD. Plaintiff alleges that Defendant Ortiz was also present at the meeting with Defendants Lytle and Tafoya Lucero in which he raised his concerns. *Id*. Plaintiff alleges that he "repeatedly elevated his wrongful detention to Defendant Ortiz[.]" *Id*. ¶ 72(v). When discussing his GTFS issues with Defendant Ortiz, Plaintiff alleges that Defendant Ortiz told him "[w]ow, I can't believe they're doing that." *Id*. ¶ 72(x). Later, "[a]fter the passing of much time and [Plaintiff's] repeated complaints to

Defendant Ortiz," Defendant Ortiz allegedly told Plaintiff "[t]hese are our practices, you're just going to have to sue us." *Id.* ¶ 72(z).[14]

      The Court's analysis here mirrors that conducted for Defendants Tafoya Lucero and Lytle: Plaintiff's complaint successfully alleges facts demonstrating that Defendant Ortiz both knew of Plaintiff's continued unlawful incarceration and continued to incarcerate him, satisfying both prongs of the qualified immunity analysis and preventing Defendant Ortiz from invoking qualified immunity at this stage of the pleadings.

## IV.   CONCLUSION

      For the foregoing reasons, Defendant CoreCivic's Motion to Dismiss Plaintiff's Third Amended Complaint, ECF No. 64, is **DENIED**; and NMCD Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint, ECF No. 68, is **GRANTED** as to Defendants Padilla, Catanach, Langston, Franco, Romero, and Anderson, and **DENIED** as to Defendants Tafoya Lucero, Lytle, and Ortiz.

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

---

[14] Plaintiff also alleges that "Defendant Ortiz's knowledge of [Plaintiff's] wrongful calculations date back to 2015 when she was Warden of the Las Cruces facility . . . [and] she signed off on his release from the facility after the 311 days issue." ECF No. 61 ¶ 72(w) (discussing the alleged failure of NMCD to credit Plaintiff for 311 days of pre-sentence confinement, eventually awarded to Plaintiff on May 19, 2015, *see id.* ¶ 42). But as with Defendant Padilla, it is unclear how knowledge of this specific incident demonstrates knowledge relevant to Plaintiff's later incarceration without lawful basis.